I «WHIPPLE, Judge.
In this challenge under the Louisiana Public Bid Law, plaintiff, Diamond B Construction. Inc. (hereinafter “Diamond B”), appeals from an adverse judgment of the trial court granting summary judgment in favor of the Department of Transportation and Development on its reconveritional demand. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
In connection with a project to upgrade U.S. Highway 171, the Louisiana Department of Transportation and Development (hereinafter “the DOTD”) advertised bidding for the project at issue in this appeal, State Project Numbers 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 and 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 (hereinafter “the project”). This reconstruction project involves the roadway on U.S. Highway 171, from Horn-beck to Florien, Louisiana, through the parishes of Vernon and Sabine, and is part of a larger, overall program undertaken to significantly upgrade U.S. Highway 171 from Shreveport to Lake Charles. The project is funded with monies from the Transportation Infrastructure Model for Economic Development, otherwise known as TIMED Project Funding. However, TIMED Project Funding covers only the initial construction and contains no provisions for future recurring periodic maintenance.
In budgeting for this project, the DOTD estimated that the project would cost $31,540,610.86. The DOTD’s Construction Cost Estimate Specifications listed Portland cement concrete as the surface type to be used for the project rather than asphaltic pavement. Initial specifications were drawn for the project-and the construction proposal was circulated and made available for review by interested bidders. By letter dated January 6, 2000, after having obtained copies of the construction proposal, Diamond B formally requested that the DOTD amend the ^design specifications and construction proposal to permit the use of “asphalt” as an alternative to Portland cement concrete as specified in the original design proposal. After meeting with Diamond B’s representatives as requested, and considering the arguments and reasons urged by Diamond B for changing the plans and withdrawing the project from the letting process, the DOTD declined to amend the project proposal and refused to cancel the bid schedule, stating: “The decision to use concrete on most of U.S. 171 was made years ago and consultants were selected with instructions to prepare the plans specifying concrete as the pavement of choice.” Thus, Diamond B was notified on January 18, 2000 that its request to delay the letting of the project and include asphalt as an alternative was denied.
In response, on January 24, 2000, Diamond B filed a petition requesting a temporary restraining order and preliminary injunction to prohibit the DOTD from issuing any bids, work orders, or to begin performing any work on the project, and *442for a judgment declaring the specifications of the project “illegal closed specifications,” and that any contract entered into for the project be declared null and void.
Diamond B alleged in its petition that requiring the contractor to use Portland cement concrete pavement to the exclusion of asphaltic concrete stifled competition and was in. direct violation of LSA-R.S. 38:2290, et seq., Louisiana’s closed specification statutes. In response, the DOTD filed an answer and reconventional demand on February 10, 2000. Despite this ongoing litigation, the bidding process was completed, and the contract was awarded to the apparent lowest bidder, Jones Brothers, Inc. of Tennessee, via a letter from the DOTD dated February 18, 2000, based on a bid in the amount of $27,534,391.92. On April 4, |42000, the trial court gave oral reasons for denying plaintiffs application for preliminary injunction and signed a judgment to that effect on April 14, 2000.2
Seeking to dismiss plaintiffs claim of violations of the closed specification laws, on February 16, 2000, intervenor, the Concrete and Aggregate Association of Louisiana (hereinafter “CAAL”) and the DOTD each filed motions for summary judgment. Those motions were later jointly supplemented by CAAL and the DOTD on February 18, 2000.3
The DOTD again filed a motion for summary judgment on April 13, 2000, seeking to dismiss plaintiffs claim of violations of the closed specification laws. Diamond B also filed motions for summary judgment against CAAL and the DOTD on March 2, 2000, and against intervenor, Jones Brothers, Inc. of Tennessee on March 3, 2000.
By judgment dated May 31, 2000, the trial court granted the DOTD’s motion citing the reasons previously rendered on April 4, 2000 for the denial of the petition for preliminary injunction, dismissing plaintiffs suit with prejudice. As sought by the DOTD, declaratory judgment was also rendered on the DOTD’s reconven-tional demand declaring that the DOTD’s failure to include alternative designs in its bid documents does not constitute a violation of LSA-R.S. 38:2290, et seq. All remaining motions filed on behalf of Diamond B, CAAL, and Jones Brothers, Inc. of Tennessee were denied.
|BOn June 8, 2000, Diamond B filed a motion for new trial on the grounds that it had received evidence on May 23, 2000, the day after the hearing on the motion for summary judgment, which would affect the results of the case. The motion was denied by the trial court on June 16, 2000.
Plaintiff now appeals, assigning the following as error:
A. The District Court erred in granting summary judgment dismissing Diamond B’s petition by interpreting “product” in La. R.S. 38:2290, et seq., to exclude Portland cement concrete and asphaltic concrete when used in highway pavement. The trial court failed to follow controlling precedent, and the trial court’s interpretation failed to conform to the purpose of “assuring uninhibited competitive bidding.”
B. The District Court erred by denying summary judgment in favor of Dia*443mond B. The trial court should have determined that asphaltic concrete and Portland cement concrete are products of equal quality and utility. The summary judgment should have granted declaratory relief and a permanent injunction as prayed for, and should have dismissed DOTD’s reconventional demand.
C. The District Court erred by denying Diamond B’s motion for a new trial to admit evidence discovered by Diamond B after the hearing on summary judgment which was withheld by DOTD in discovery without justification. The newly discovered evidence shows that during the pendency of this suit, DOTD’s Pavement Structure Review Committee determined that Portland cement concrete pavement and asphaltic concrete pavement are of equal quality and utility and recommended a mechanism for alternate bidding. The Chief Engineer approved the recommendation indicating DOTD’s intention to competitively bid pavement. Diamond B’s motion for a new trial should have been granted under La. C.C.P. art. 1972(2).
D. The District Court erred in refusing to supplement the record under La. C.C.P. art. 2132 to include judicial confessions by DOTD in a memorandum which was filed by DOTD with the trial court, but not filed into the record with the clerk of court.
DISCUSSION
A motion for summary judgment is a procedural device used to avoid a full-scale trial where there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1st Cir.6/20/97), 696 So.2d 1031, 1034, writ denied, 97-/19116 (La.10/31/97), 703 So.2d 29. It should only be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966.
Previously, our cases held that summary judgments were not favored and were to be used cautiously and sparingly. Any doubt was to be resolved against granting the motion and in favor of a trial on the merits. However, in 1996, the legislature amended LSA-C.C.P. art. 966 to overrule the presumption in favor of trial on the merits. Summary judgments are now favored, and the documents submitted by both parties are to be equally scrutinized. Berzas v. OXY USA, Inc., 29,835, pp. 4-5 (La.App. 2nd Cir.9/24/97), 699 So.2d 1149, 1152;. Hayes v. Autin, 96-287, p. 6 (La.App. 3rd Cir.12/26/96), 685 So.2d 691, 694, writ denied, 97-0281 (La.3/14/97), 690 So.2d 41.
In 1997, by Act No. 483, the legislature again amended LSA-C.C.P. art. 966 to incorporate the federal summary judgment analysis. Under the amended version of LSA-C.C.P. art. 966, the initial burden continues to remain with the mover to show that no genuine issue of material fact exists. If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action or defense, then the nonmoving party must come forward with factual support sufficient to establish that he will be able to satisfy his evidentia-ry burden of proof at trial. LSA-C.C.P. art. 966(C)(2). If the nonmoving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. LSA-C.C.P. arts. 966 and 967; Berzas, 29,835 at p. 8, 699 So.2d at 1154.
Appellate courts review summary judgments de novo under the same criteria that govern the trial court’s determination of whether a summary judgment |7is appropriate. Sanders, 96-1751 at p. 7, 696 So.2d at 1035. Because it is the applicable substantive law that determines materiality, whether or not a particular fact in dispute is material can be seen only in *444light of the substantive law applicable to the case. Ledet v. Quality Shipyards, Inc., 615 So.2d 990, 992 (La.App. 1st Cir. 1993); Williams v. Shoney’s, Inc., 99-0607, p. 4 (La.App. 1st Cir.3/31/00), 764 So.2d 1021, 1023.
STATUTORY MEANING OF “PRODUCT”
(Assignment of Error A.)
In this assignment, plaintiff contends that the trial court incorrectly interpreted “product,” as found in LSA-R.S. 38:2290, to exclude Portland cement concrete and asphaltic concrete. As set forth in LSA-R.S. 38:2290:
A. No architect or engineer, either directly or indirectly, shall submit a closed specification of a product to be used in the construction of a public building or project, unless all products other than the one specified would detract from the utility of the building or except in those cases where a particular material is required to preserve the historical integrity of the building or the uniform appearance of an existing structure.
B. A closed specification shall not be submitted or authorized when any person or group of persons possess the right to exclusive distribution of the specified product, unless the product is required to expand or extend an existing system presently operating at the facility or site. However, no such closed specifications shall be allowed until rules have been promulgated by the division of administration after oversight by the Senate and House Committees on Transportation, Highways and Public Works and other appropriate legislative committees.
(Emphasis added.)
In support of its claim that the trial court erred in its interpretation of the definition of “product” herein, plaintiff primarily cites Stevens Concrete Pipe & Products, Inc. v. Burgess, 252 La. 136, 209 So.2d 733 (1968), which it interprets as standing for the proposition that Portland cement concrete is a product. In that case, where concrete pipe was found to be a product, plaintiff, Stevens, | ¡¡challenged a requirement by the East Baton Rouge City-Parish Council that twelve-foot pipe be used to the exclusion of eight-foot pipe where there was only one local facility capable of manufacturing the specified twelve-foot pipe. Having found that both pipes were of equal utility, the Supreme Court held “that the specification for a minimum length of twelve foot pipe was a closed specification of a product which came within the ban of R.S. 38:2290— 38:2296.” Stevens Concrete Pipe & Products, Inc., 209 So.2d at 738.
The Supreme Court noted therein that the purpose of the closed specification law is clear and unequivocal: “to supplement our low bidder statute, R.S. 38:2211 et seq., to assure competitive bidding which heretofore could be stifled by the use of closed specifications excluding products of equal utility and appearance.” Stevens Concrete Pipe & Products, Inc., 209 So.2d at 739. The Court concluded that these objectives could not be accomplished with only one local facility able to produce the product, i.e., the particular length of pipe, specified by the City-Parish Council in its design requirements. Accordingly, the pipe was deemed a “product” and the design documents were stricken as containing “prohibited closed specifications.”
In the case at hand, the DOTD’s Chief Engineer, Roderick Dillon, testified that pavement, whether it be asphaltic concrete or Portland cement concrete, constitutes a design, not a product. He explained that Portland cement concrete is not a product, but instead is comprised of many individual things that are products, such as cement, additives, flash, water, reducer sand, and gravel. Asphaltic concrete, as well, is not a product in and of itself. Asphaltic concrete is comprised of individual products such as aggregate, liquid asphalt, and additives. Notably, the additives found in *445Portland cement concrete are different from those found in asphaltic cement.
J^Harold Paul, the Associate Director of Research for the Louisiana Transportation Research Center, described asphalt cement as a bi-product of the refining process, i.e., the material that comes out of the bottom of the barrel from the crude production slate. He testified that asphaltic concrete, which is made up of materials such as fine aggregate material, course aggregate material, fillers and other additives, is part of a pavement system. Likewise, Portland cement concrete, which is made up of a number of different materials, is mixed continuously until laid down on the roadway to form its own pavement system. Based on these important distinctions, Paul did not consider pavement systems to be a “product.” Rather, he testified that whereas these different pavement systems are made up of a number of different materials that are products, but the pavement systems are not products in and of themselves.
William Temple, the Assistant Secretary for the DOTD, testified that asphaltic cement concrete pavement designs and Portland cement concrete pavement designs are not considered to be products of apparent equal quality and utility. In concluding that pavement constitutes a system, a design, rather than a product. Temple stated, “Pavement is a system— it’s a facility system that is created out of constituent individual products, perhaps, or individual materials, combined in such a way that it can serve the needs — successful pavement would serve the needs of the traveling public.”
Furthermore, considering the provisions of LSA-R.S. 38:2290B, the record shows that no one “person or group of persons possesses] the right to exclusive distribution of the specified product.” In fact, Roderick Dillon, the Chief Engineer for the DOTD, testified that Portland cement concrete, which was specified for this bid, was readily available to all contractors, Dillon further testified that there was sufficient competition for the bid. Noting that there were five bidders for the | inconcrete job, he concluded that the spread of bids that he received on this job was “very good.” Harold Paul likewise testified that the materials that comprise Portland cement concrete are available on the general market in the state and are not limited in availability to only certain contractors. Thus, the DOTD maintained, there was no stifling of the bidding process.4
We find the instant case readily distinguishable from Stevens. In Stevens, twelve-foot concrete pipe was specified to the exclusion of eight-foot concrete pipe. Both pipes were made of the same substance, Portland cement concrete, with the sole difference being the length. Here, the evidence and testimony are quite clear that Portland cement concrete and asphaltic concrete are different substances comprised of different materials. A second distinguishing factor between Stevens and the instant case is that in Stevens, the competitive bidding process clearly was stifled, inasmuch as there was only one local facility capable of manufacturing the particular twelve-foot pipe specified in the bid package. Plaintiff has failed to establish any such problem in the case at hand. In fact, based upon the above and foregoing testimony, the materials for Portland cement concrete are readily available to all contractors and there has been ample competition in the bidding process.
In rejecting Diamond B’s claim, the trial court concluded that if an article is general merchandise found in general markets, then it is not a product under LSA-R.S. 38:2290. Relying on Judge Ellison’s reasoning in Cleveland Trinidad Paving Company v. Lord, 145 Mo.App. 141, 130 S.W. 371, (1910), the trial court stated:
*446This court finds that if an article is general merchandise found in general markets, then it [is] not a product under this statute. To find otherwise would prohibit the government from ordering chicken ^without a suit from the purveyors of pork alleging that “the other white meat” is being excluded by a closed specification.
The principle set out by Judge Ellison has been adopted by other courts and appears to be the prevailing law in the country.
On appeal, Diamond B challenges the trial court’s reasoning, and its resort to jurisprudence from other jurisdictions. Pretermitting comment on the analysis employed by the trial court as set forth in its oral reasoning, we find the court’s ruling was eminently correct.
Based on the testimony and evidence in the record before us, including the fact that Portland cement concrete was readily available to all contractors, we likewise conclude that Portland cement concrete, as designated in the design specifications of a pavement system, is not a “product” under LSA-R.S. 38:2290.
Thus, we find no merit to this assignment.
DETERMINING PRODUCTS OF EQUAL QUALITY AND UTILITY
(Assignment of Error B.)
Secondly, plaintiff contends that the trial court erred by denying summary judgment in its favor and determining that asphaltic concrete and Portland cement concrete are not products of equal quality and utility. Thus, plaintiff contends, summary judgment should have been rendered herein granting declaratory relief, a permanent injunction as prayed for, and dismissal of the DOTD’s reconventional demand.
In the case at hand, numerous witnesses testified overwhelmingly that Portland cement concrete and asphaltic cement are not equivalent in terms of quality, performance, appearance, strength and utility. Plaintiffs expert, George M. Hammitt, II, Ph.D., testified that asphaltic cement and Portland cement do not have the same reaction with the materials surrounding them when they are applied and they react differently to stresses. He described the primary difference between |12the two in terms of how they distribute the load. Another and a crucial difference described by Hammitt is that asphaltic cement requires resurfacing after approximately ten years, possibly from thirteen to seventeen, whereas Portland cement concrete typically does not require resurfacing within the first twenty years. Thus, considering the restrictions on the purpose for which funding was provided, the DOTD design specified Portland cement concrete for this project. Hammitt further testified that the designs of the two materials are quite different. He noted that according to “AASHTO design” and tests that have been conducted to validate these designs, “11 inches of concrete is equivalent to about 17 inches of a flexible pavement or an asphaltic concrete surface, according to the AASHTO design.”
W. Wayne Marchand, the DOTD District Administrator for District 08 testified that concrete pavement was requested because concrete actually provides a better pavement structure with less maintenance than asphalt and that Portland cement concrete “wears a lot better than asphaltic concrete.” He went on to state that the roadway in this particular project experiences a heavy volume of truck traffic, particularly from the logging industry. The biggest problem that the DOTD has experienced from this type of traffic on asphalt is rutting caused by the trucks. Marchand testified:
Asphaltic concrete invariably has rutting immediately almost ... And that’s something that we have to address fairly soon because rutting is a problem when it’s raining.
*447Rutting will trap water. It does not allow the rainwater to more or less shed off and then when it ponds water, the traffic can hydroplane and it just causes people problems on there. It’s very undesirable.
Marchand delineated other problems that frequently occur with asphalt, including “stripping” and “deterioration of the base.” He stated that none of these problems occur with Portland cement concrete. He • further opined that “asphaltic concrete is |ianot at all equivalent to the Portland cement concrete.” Thus, he and his engineers requested that this particular roadway be conducted with Portland cement concrete because it requires far less maintenance than asphaltic cement, lasts longer, and provides a safer roadway.
J.B. Esnard, Jr., the Pavement and Geo-technical Design Engineer for the DOTD, testified that based on structural coefficients in design, Portland cement concrete and asphaltic concrete are not equivalent. Also, when asked if asphaltic concrete was equivalent to Portland cement concrete in terms of utility, performance, appearance, and quality, Esnard responded:
No, it’s not, especially in performance. Like I stated before, the maintenance required on an asphalt pavement that ruts is a substantial cost to us and in a lot of cases these quote, maintenance costs are not borne out of federal aid dollars and it comes directly out of the maintenance budget.
Harold Paul testified that Portland cement concrete and asphaltic concrete are not of the same quality and utility, as Portland cement concrete is stronger than asphaltic concrete. Likewise, William Temple stated that they are not of equal quality and utility, based on the performance he has seen involving the two systems. He testified that the average structural overlay cycle for asphalt is twelve to fifteen years, while the average overlay cycle for rigid pavement, such as Portland cement concrete, is twenty years. Furthermore, Thomas D. White, Ph. D., another expert witness for plaintiff, conceded that inch for inch, asphaltic cement concrete is not as strong as Portland cement concrete.
Roderick Dillon testified that the two are not of the same quality and strength and went on to describe problems associated with the use of asphalt, such as rutting and stripping. As chief Engineer for the DOTD, Dillon had personal knowledge of early failure problems with asphaltic concrete pavement designs. In support of his preference for Portland cement concrete over asphaltic concrete l14pavement, he noted two primary concerns: (1) to eliminate the disruption of traffic within a certain number of years after the pavement is constructed for the maintenance required with the use of asphaltic concrete; and (2) the load factor in an area, such as this roadway, where there is a predominance of heavy truck traffic. Dillon testified, “They are not equivalent as far as the projected maintenance possibilities of the particular pavements are concerned and also the strength would be different as far as the inches per inch of pavement would be concerned.”
Finally, the Secretary of the DOTD, Kam Movassaghi, Ph. D., also testified that inch for inch, the two are not- of the same quality and strength, and that based on the different types of materials used in each they have different life expectancies, and that concrete pavement is known to last longer.
Thus, on the record before us, we likewise find that the DOTD clearly established by the necessary evidentiary proof that Portland cement concrete and asphaltic concrete are not equivalent in terms of quality, performance, appearance, strength and utility.
This assignment also lacks merit.
MOTION FOR NEW TRIAL
(Assignment of Error C.)
Diamond B also assigns as error the trial court’s denial of its motion for *448new trial when evidence was newly discovered after the hearing on summary judgment.
Louisiana Code of Civil Procedure article 1972 lists the criteria for a new trial and provides as follows that a new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
|1K(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
In addition to the above, a discretionary ground for a new trial is set forth in LSA-C.C.P. art.1973, which authorizes a trial court to grant a new trial in any case if there is good grounds therefor. Belle Pass Terminal, Inc. v. John, Inc., 92-1544, 92-1545 (La.App. 1st Cir.3/11/94), 634 So.2d 466, 492, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094.
Louisiana jurisprudence is clear that a new trial should be ordered when the trial court, exercising its discretion, is convinced by its examination of the facts that the judgment would result in a miscarriage of justice. Bush v. Cannata’s Supermarket, Inc., 612 So.2d 794, 797 (La.App. 1st Cir.1992). The denial of a motion for new trial should not be reversed unless there has been an abuse of the trial court’s discretion. Perkins v. K-Mart Corp., 942065, pp. 8-10 (La.App. 1st Cir.6/23/95), 657 So.2d 725, 731. Applying these precepts to the case before us, we find no error.
In the instant case, plaintiff filed a motion for new trial on the grounds that on May 23, 2000, the day after the trial court ruled on the motions for summary judgment, it received, from an outside source, a copy of a DOTD document styled “In-tradepartmental Correspondence, Memorandum,” dated April 12, 2000, authored by William H. Temple, the Chairman of the Pavement Structure Review Committee for the DOTD. Diamond B contends that this memorandum, which discusses Life Cycle Cost Models and Design Reliability Factors, constitutes a “comparison” and thus establishes the DOTD’s personal knowledge that Portland cement concrete and asphaltic concrete pavement are equivalent, arguing that 11fi“one can not logically compare alternative pavement types unless first designed to be co-equal in quality and utility.”
After considering the memorandum, which was submitted to the trial court along with Diamond B’s motion for new trial, the court rejected Diamond B’s arguments and concluded no grounds had been shown for granting a new trial. After reviewing the memorandum, we agree and conclude that the trial court did not abuse its discretion in denying plaintiffs motion for new trial under LSA-C.C.P. art. 1972. Even taking as true the information contained in the memorandum, which was not authenticated or formerly introduced into evidence, we find nothing in the memorandum supporting the interpretation urged by Diamond B. Instead, the memorandum is consistent with the DOTD’s position throughout these proceedings. As set forth above, the record clearly demonstrates that the judgment is not contrary to the law and the evidence; nor do the facts established herein indicate that the judgment would result in a miscarriage of justice.
Thus, this assignment lacks merit.
SUPPLEMENTATION OF RECORD
(Assignment of Error D.)
Lastly, Diamond B assigns as error the trial court’s denial of its request to supplement the record to include “Defendant’s Memorandum In Opposition To Plaintiffs Partial Summary Judgment, Preliminary Injunction, And Permanent *449Injunction,” which plaintiff contends is replete with adverse judicial admissions by the DOTD.
Louisiana Code of Civil Procedure article 2132 provides:
A record on appeal which is incorrect or contains misstatements, irregularities or informalities, or which omits a material part of the trial record, may be corrected even after the record is transmitted to the appellate court, by the parties by stipulation, by the trial court or by the order of the appellate court. Ii7A11 other questions as to’ the content and form of the record shall be presented to the appellate court.
(Emphasis added.)
Diamond B concedes that this memorandum was not introduced as part of the trial court proceeding, nor has plaintiff shown that this memorandum was proffered during the trial court proceedings. In arguing that the memorandum should be included in the appellate record, plaintiff contends that a copy of the memorandum was filed with “the court,” but was not introduced into the record with the clerk of court. Plaintiff further contends that this memorandum was discussed in open court on two separate occasions; however, these discussions are not found in the transcripts lodged with this court for our review.
Louisiana Code of Civil Procedure article 2132, which permits the correction of evidence which was actually introduced at trial, does not permit introduction of new evidence after the transcript of the appeal is filed in the appellate court. Sutton v. Montegut, 544 So.2d 1181, 1184 (La.App. 5th Cir.1989). Moreover, the court of appeal has no jurisdiction to receive new evidence. Sutton v. Montegut, 544 So.2d at 1184; Brown v. Department of Environmental Quality, 597 So.2d 174, 175 (La.App. 1st Cir.1992).
Although the DOTD, at oral argument, withdrew its objection to this court considering the memorandum, applying the foregoing jurisprudence and LSA-C.C.P. art. 2132, which provides a procedure for correction of the trial record only, we hereby vacate and recall the interim order signed by this court on September 18, 2000, allowing for supplementation of the appellate record to include “Defendant’s Memorandum In Opposition To Plaintiffs Partial Summary Judgment, Preliminary Injunction, And Permanent Injunction,” and direct the hsClerk of Court for the First Circuit Court of Appeal to return these documents to plaintiff.5
CONCLUSION
For the above and foregoing reasons, the May 31, 2000 judgment of the trial court dismissing plaintiffs suit, granting declaratory judgment on the DOTD’s re-conventional demand, and denying all remaining motions filed on behalf of Diamond B, CAAL, and Jones Brothers, Inc. of Tennessee, is affirmed.
The interim supplementation order signed by this court on September 18, 2000, is hereby recalled and vacated; the Clerk of Court is hereby directed to return the documents to plaintiff.
Costs in this matter in the amount of $1,225.41 are hereby assessed against plaintiff, Diamond B Construction Company, Inc.
AFFIRMED; INTERIM ORDER SUPPLEMENTING RECORD VACATED AND RECALLED.

. An application for supervisory writs was filed by Diamond B and later denied by this court, as the matter had been decided on the merits and appeals arising from the judgment had been taken and docketed as expedited appeals. See Diamond B Construction Company, Inc. v. Louisiana Department of Transportation and Development, 00-1007 (La.App. 1st Cir.8/4/00). The denial of the preliminary injunction is the subject of the appeal the companion case of Diamond B Construction Company, Inc. v. Louisiana Department of Transportation and Development, 00-1323 (La.App. 1st Cir. 12/22/00), 780 So.2d 436, also decided this date.

. The record does not clearly indicate the disposition of these motions in particular. However, in granting the subsequent motion for summary judgment filed by the DOTD, upon which this appeal is based, the trial court stated it was “denying all remaining motions.”

. Dillon added that, on many highway projects, the DOTD specifies asphaltic concrete to the exclusion of Portland cement concrete, where such use is deemed more appropriate.

. Even assuming arguendo that the memorandum erroneously filed was an admissible part of the record, we find no support for plaintiff's arguments regarding the "statements” therein.